**UNITED STATES BANKRUPTCY COURT
DISTRICT OF MAINE**

| | |
|---|---|
| In re:<br><br>**MORIN BRICK COMPANY, INC.,**<br><br>Debtor. | **Chapter 11**<br><br>**Case No. 08-21022** |

**MOTION FOR ORDER APPROVING: (I) BIDDING PROCEDURES BY WHICH THE DEBTOR MAY SELL SUBSTANTIALLY ALL OF ITS ASSETS AND ASSUME AND ASSIGN CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES; (II) A BREAK-UP FEE AND OVERBID PROTECTIONS; (III) PROCEDURES TO ESTABLISH CURE AMOUNTS IN CONNECTION WITH ASSUMED CONTRACTS AND LEASES; AND (IV) FORM OF NOTICE OF SALE**

### I. Introduction

Pursuant to 11 U.S.C. §§ 105, 363 and 365, Morin Brick Company, Inc., the debtor and debtor in possession in this Chapter 11 proceeding (the "Debtor"), requests that this Court enter an order in the form attached hereto approving: (i) the bidding procedures by which the Debtor may sell substantially all of its assets and assume and assign certain executory contracts and unexpired leases (if any); (ii) the Break-Up Fee, Expense Reimbursement and other overbid provisions (as set forth herein); (iii) a procedure to establish cure amounts in connection with any assumed and assigned contracts or leases; and (iv) the form of notice of sale which establishes a hearing date, and objection and overbid deadlines with respect to such sale (the "Motion"). The Debtor has also filed a Motion for Authority to Sell Substantially All of the Debtor's Assets to Hillcrest Management, LLC Free and Clear of Liens, Claims and Encumbrances and for Approval of the Assumption and Assignment of Certain Leases and Executory Contracts (the "Sale Motion"). Pursuant to the Sale Motion, the Debtor has requested that this Court enter an order authorizing the Debtor to consummate a sale of substantially all of its assets (the "Acquired

1

Assets," as more fully described herein) to Hillcrest Management, LLC (or an Affiliate[1] of Hillcrest Management, LLC, hereinafter "Hillcrest" or the "Buyer") or to such other party who has submitted a higher and better offer for the Acquired Assets and to assume and assign certain executory contracts and unexpired leases, if any (collectively, the "Assigned Contracts"), to Hillcrest or such other party. As used herein, the term "Purchased Assets" shall mean the Acquired Assets and the Assigned Contracts collectively.

The Debtor states in support of this request the following:

## II. Background

1. The Debtor is engaged in the business of manufacturing moulded waterstruck brick and extruded brick for customers primarily located in the Northeastern United States and Canada. The Debtor manufacturers its products at a plant facility located in Auburn, Maine. In addition to the plant facility in Auburn, the Debtor also operates showrooms located in Auburn and Brewer, Maine.

2. Prior to the filing of the Chapter 11 case, the Debtor's operations were financed pursuant to secured financing arrangements with Bank of America, N.A., as successor by merger to Fleet National Bank ("Bank of America"), including: (a) that certain Line of Credit Note pursuant to which Bank of America provided the Debtor with a revolving line of credit in the maximum amount of $2.6 Million; and (b) that certain Letter of Credit Note pursuant to which Bank of America provided certain loans to the Debtor in relation to financing certain modifications to the plant facility located in Auburn, Maine. In order to secure the obligations of

---

[1] Capitalized terms not specifically defined herein shall have the meaning assigned to such terms in the Asset Purchase Agreement, a copy of which is attached to the Sale Motion as **Exhibit A** and is incorporated herein by reference.

the Debtor to Bank of America, the Debtor granted Bank of America a security interests in all assets of the Debtor.

3. Unable to satisfy its obligations as they came due, including its obligations to Bank of America, the Debtor filed a petition for relief under chapter 11 of the Bankruptcy Code on September 3, 2008. The Debtor continues to operate its business as a debtor in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code. An Official Committee of Creditors Holding Unsecured Claims was appointed on September 9, 2008 (the "Committee") and the Committee has retained counsel. No trustee or examiner has been appointed in this case.

4. Bank of America has provided post-petition financing to the Debtor in the form of allowing the Debtor to continue to utilize the Line of Credit established pursuant to the Line of Credit Note in accordance with the terms of certain post-petition financing orders entered by this Court (collectively the "DIP Financing Orders").

5. Beginning with the retention of The Daymark Group, LLC early in the Chapter 11 proceedings, the Debtor has been actively engaged in marketing the Debtor's assets for sale. As a result of this marketing effort, on February 4, 2009, the Debtor and Hillcrest entered into a letter of intent relating to the possible purchase by Hillcrest of substantially all of the assets of the Debtor (the "Letter of Intent").

6. After entering into the Letter of Intent, Hillcrest began performing its due diligence in relation to a possible sale transaction and the Debtor and Hillcrest began negotiating the terms of an Asset Purchase Agreement relating to the sale (the "APA"), and agreed to present the APA to this Court to establish the sale procedures associated with any sale as well as to approve certain "bid protections" to Hillcrest as the stalking horse offeror. The Debtor and Hillcrest have reached agreement on virtually all of the material terms of the APA. A true and

correct copy of the APA in its most recent form is attached to the Sale Motion as **<u>Exhibit A</u>** and is incorporated herein by reference. The Debtor and Hillcrest intend to sign the APA in substantially the form attached to the Sale Motion on or before any hearing date relating to this Motion.

7. Since the Petition Date, the Debtor has had extensive discussions with a number of interested parties. After negotiations with Hillcrest, and expressions of interest from other potential strategic and other buyers, the Debtor now believes, in the exercise of its best business judgment, that the best way to maximize value for all stakeholders and to insure the long-term future of the Debtor's business is to conduct a sale process with Hillcrest acting as a stalking horse bidder.

### III. Summary of Proposed Sale

8. After extensive negotiations with Hillcrest, the Debtor and Hillcrest have reached agreement in relation to the material terms of the APA. The Debtor agreed to present the APA to this Court in its current form to establish the sales procedures associated with any sale as well as approve certain bid protections to Hillcrest as the stalking horse bidder. The APA contains the material terms of Hillcrest's proposed purchase of substantially all of the Debtor's assets.

9. The APA can be summarized as follows:[2]

(a) <u>Purchased Assets</u>. Upon the terms and subject to the conditions of the APA, at the Closing, the Debtor shall sell, assign, transfer, convey, and deliver to Buyer pursuant to Sections 105, 363, and 365 of the Bankruptcy Code, and Buyer shall purchase from the Debtor, all assets and rights of the Debtor that are used or held for use in, or that arise from or relate to, the conduct of Debtor's business, other than the Excluded Assets (defined below), including the following assets, free and clear of all Liens to the fullest extent permissible under the Bankruptcy Code:

---

[2] The description set forth herein is a summary of the terms and conditions of the APA. For a complete description of the terms of the APA, the Debtor refers all parties to **<u>Exhibit A</u>** to the Sale Motion.

(i)  all raw materials, work in process, finished goods, supplies and inventory on the Closing Date and all computer records and other records relating to the foregoing;

(ii)  all personal property and interests therein, including, without limitation, vehicles, machinery, equipment, furniture, office equipment, molds, patterns and dies, tools, fixtures and other tangible property of any kind or nature;

(iii)  all general intangibles and, to the extent not otherwise constituting general intangibles, any interest of the Debtor in any and all claims by the Debtor against any other person, contingent or otherwise, known or unknown, including, without limitation, all rights under express or implied warranties from suppliers, claims for collection or indemnity, and choses in action other than choses in action relating to Excluded Assets;

(iv)  all rights and interests, but no Liabilities or other obligations other than the Assumed Liabilities;

(v)  all Assigned Permits;

(vi)  all Intellectual Property;

(vii)  except as set forth in subsection (d) of **Exhibit 2.2** of the APA, all books, records, files and papers, whether in hard copy or computer format, including, without limitation, all materials, manuals, sales and promotional materials and records, advertising materials, customer lists, supplier lists, mailing lists, distribution lists, business plans, litigation files, credit information, cost and pricing information, blueprints for tools, machines and machine components, and all documents embodying the Intellectual Property, in each case relating to the Acquired Assets, excluding records which are attorney-client privileged or considered attorney work product;

(viii)  any telephone and facsimile numbers, e-mail addresses and post office boxes;

(ix)  all insurance benefits, including rights and proceeds, and similar items, arising from or relating to the Acquired Assets prior to the Closing Date;

(x)  all accounts receivable on the books and records of the Debtor on the Closing Date that are sixty (60) days old or less on the Closing Date and the Additional Discounted Accounts Receivable, if any;

(xi)  any or all of the Debtor's Employee Plans that the Buyer elects to assume at the Closing pursuant to Section 8.15 of the APA;

(xii) all Real Property; and

(xiii) the specific property listed in the attachment to **Exhibit 2.1** of the APA, including Assigned Contracts so listed, and Assigned Contracts added to **Exhibit 2.1** pursuant to Section 2.1 of the APA.

(b) Purchase Price. The purchase price (the "Purchase Price") for the Acquired Assets shall be calculated as follows:

(i) the book value of the Debtor's inventory on the Closing Date minus $310,000.00; plus

(ii) the book value of the Debtor's accounts receivable on the Closing Date which are sixty (60) days old or less on the Closing Date multiplied by ninety percent (90%); plus

(iii) an amount equal to $13,428 for the continued employment of three maintenance employees through the Closing Date; plus

(iv) in the event the Debtor agrees to sell and the Buyer agrees to purchase certain Aged Accounts Receivable pursuant to Section 8.14 of the APA, an amount equal to the Additional Discounted Accounts Receivable Purchase Price; minus

(v) $3,000.00 relating to the reimbursement to the Buyer for certain environmental work performed in relation to the sale.

Subject to adjustment as set forth above, the Debtor and Hillcrest believe the Purchase Price will equal approximately in the range of $2.7 Million to $2.9 Million.

(c) Excluded Assets. Notwithstanding anything in Section 2.1(a) of the APA to the contrary, the Debtor shall not sell, convey, assign, transfer, or deliver to Buyer, and Buyer shall not purchase, and the Purchased Assets shall not include, the Debtor's right, title, and interests in and to the following assets of the Debtor (the "Excluded Assets"):

(i) all rights of the Debtor under the APA, the Ancillary Agreements and the agreements and instruments executed and delivered to the Debtor by the Buyer pursuant to the APA;

(ii) all cash, cash equivalents and securities in entities other than the Debtor owned by the Debtor;

(iii) all of the Debtor's books, records, ledgers, files and documents relating to Excluded Assets;

(iv) the Debtor's formal corporate records, including its certificate of incorporation, bylaws, minute books, corporate books, stock transfer

records and other records having to do with the corporate organization of the Debtor;

(v) any Tax attributes of the Debtor, including, without limitation, any net operating loss carryovers and any right or claim for a Tax refund or rebate attributable to the Pre-Closing Period;

(vi) all personnel records and other records that the Debtor is required by any Law to retain in its possession;

(vii) all causes of action under chapter 5 of the Bankruptcy Code;

(viii) all of the Debtor's Employee Plans except for those that the Buyer expressly elects to assume at the Closing pursuant to Section 8.15 of the APA;

(ix) all accounts receivable on the books and records of the Debtor on the Closing Date that are more than sixty (60) days old except for the Additional Discounted Accounts Receivable, if any; and

(x) cash, U.S. treasury bills and money market accounts.

(d) Break-Up Fee and Overbid Protections. The APA requires that the Bankruptcy Court shall have entered an order, in a form reasonably satisfactory to Hillcrest ("the Bid Protection Order") approving bid protections (the "Bid Protections"), which shall include the following:

(i) Expense reimbursement equal to the actual fees, costs and expenses of Hillcrest incurred in relation to the sale transaction, provided, however, that in no event will the expense reimbursement exceed $100,000.00 payable from and at a closing of an Alternative Transaction from a successful competing bid and payable in accordance with the terms of the APA (the "Expense Reimbursement");

(ii) A break-up fee equal to $75,000.00 payable from and at a closing of an Alternative Transaction from a successful competing bid and payable in accordance with the terms of the APA (the "Break-Up Fee"); and

(iii) Bid protections equal to an initial overbid equal to $75,000.00, resulting in an initial overbid in the aggregate of not less than $250,000.00 and subsequent bidding increments of not less than $25,000.00, with such subsequent bidding increments subject to adjustment by the Debtor in consultation with the Committee, to the extent that such adjustments, if any, will better promote the goals of the Bidding Process.

(e) <u>Solicitation of Overbids</u>.  The APA recognizes the solicitation of overbids for the Acquired Assets in accordance with the bidding procedures to be established by the Bankruptcy Court.

10. To attract higher and better offers for the sale of its business, the Debtor seeks the approval of certain bidding procedures to maximize the value of the Purchased Assets.  Pursuant to this Motion, the Debtor seeks Court approval of the bidding procedures with respect to the Auction (as defined herein) for the sale of the Acquired Assets and the assignment of the Assigned Contracts, including approval of the Break-Up Fee and Expense Reimbursement (each payable to Hillcrest upon the occurrence of certain events as described in the APA), overbid protections, and the form of notice of sale to be disseminated to the various parties.  As noted, the Debtor will separately file the Sale Motion which seeks approval of the sale of the Acquired Assets to Hillcrest, subject to higher and better bids.

### IV. **Break-Up Fee, Expense Reimbursement and Overbid Protection**

11. The APA provides for the payment of the Break-Up Fee and Expense Reimbursement to Hillcrest, as well as overbid protections.  Such provisions provide Hillcrest with protection and compensation in consideration of its agreement to enter into the APA notwithstanding the uncertainties presented by a sale of this nature.  Hillcrest requires the approval of the Break-Up Fee, Expense Reimbursement and other overbid protections on an advance basis in order to proceed with its offer as set forth in the APA, and thus the Debtor requests that the Court approve such provisions.

A. **<u>Request for Approval of the Break-Up Fee and Expense Reimbursement Provisions</u>.**

12. The APA provides that upon the occurrence of certain events, the Debtor will be obligated to pay Hillcrest the Expense Reimbursement and the Break-Up Fee as described above.

13. Hillcrest has incurred and will incur significant time, expense and costs in negotiating the terms of the APA, as well as in conducting due diligence.  The APA will serve as

a basis by which other offers, if any, will be measured. In light of these considerations, the Debtor believes that the Break-Up Fee and the Expense Reimbursement are reasonable and should be approved by this Court.

14. Break-up fees serve a number of useful functions: (a) they attract bidders; (b) they help to insure that a bidder does not withdraw its bid; and (c) they help to establish a bid standard for other bidders. <u>In re Great Northern Paper, Inc.</u>, 299 B.R. 1 (D. Me. 2003); <u>see also</u> <u>In re Integrated Resources, Inc.</u>, 147 B.R. 650, 661-62 (S.D.N.Y. 1992); <u>In re Hupp Indust.</u>, 140 B.R. 191, 194 (Bankr. N.D. Ohio 1991) ("without such fees, bidders would be reluctant to make an initial bid for fear that their first bid will be shopped around for a higher bid from another bidder who would capitalize on the initial bidder's . . . due diligence").

15. Courts consider three questions in assessing the appropriateness of break-up fees: (a) whether the relationship between the parties who negotiated the break-up fee is tainted by self-dealing or manipulation; (b) whether the fee hampers, rather than encourages, bidding; and (c) whether the amount of the break-up fee is reasonable relative to the proposed purchase price. *See* <u>Integrated Resources</u>, 147 B.R. at 657; <u>see also</u>, <u>In re Shepherds Hill Dev. Co. LLC</u>, 2000 WL 33679430 (Bankr. D.N.H., March 24, 2000).

16. Applying this test to the Break-Up Fee and the Expense Reimbursement, it should first be noted that the Break-Up Fee and the Expense Reimbursement are the products of arm's length negotiations between unrelated parties. Second, the Break-Up Fee and the Expense Reimbursement encourage meaningful bidding by: (a) attracting and retaining Hillcrest's bid, where no other party was willing to make, on substantially similar terms, a firm offer to acquire all or a portion of the Debtor's assets within a reasonable time and to finance operations pending a sale; and (b) establishing a benchmark against which the Debtor can evaluate overbids. Third,

the Debtor believes the Break-Up Fee and the Expense Reimbursement are fair and reasonable relative to the amount to be paid to the Debtor if the Sale Motion is approved. Based on the Debtor's valuation of the Hillcrest offer and assuming the Break-Up Fee and Expense Reimbursement reach their maximum of $175,000.00, the Break-Up Fee and the Expense Reimbursement in the aggregate will equal approximately between 6% and 6.5% of the value of the Hillcrest offer. Viewed in this light, the Break-Up Fee and the Expense Reimbursement are reasonable relative to the proposed Purchase Price.

**B.     The Appropriateness of the Overbid Provision.**

17.     The APA contemplates that any competing offer for the Purchased Assets must provide that (i) an initial minimum overbid must be no less than $250,000.00 more than the Hillcrest offer (aggregating the Break-Up Fee, the Expense Reimbursement and the initial overbid protection amount) and (ii) subsequent bidding increments must be no less than $25,000.00 more than the previous bid. Given the size of this transaction, subsequent bidding increments of $25,000.00 will not discourage competing bids at an auction.

### V.     Proposed Bidding Procedures

**A.     Pre-Auction Bidding**

18.     To ensure that the estate receives the highest and best offer for the Purchased Assets, the Debtor will solicit competing bids for the Purchased Assets pursuant to the proposed bidding procedures attached hereto as **Exhibit A**. In summary, the bidding procedures provide for the following process in connection with the sale of the Purchased Assets:

(a)     **Qualified Bidders.** Under the bidding procedures, only Qualified Bidders may submit overbids for the Purchased Assets, or otherwise participate in the Auction. In order to be deemed a Qualified Bidder, each person other than Hillcrest (a "Potential Bidder") must: (i) deliver to the Debtor an executed confidentiality agreement in form and substance satisfactory to the Debtor and its counsel (the "NDA"); (ii) deliver to the Debtor an executed asset purchase agreement marked

to show modifications to the APA by and between the Debtor and Hillcrest (the "Potential Bidder APA"), including, but not limited to, the price; (iii) deliver to the Debtor a deposit equal to ten percent (10%) of the amount of the offer made by such Potential Bidder; (iv) provide written evidence, satisfactory to the Debtor, of the Potential Bidder's ability to close on any proposed transaction; (v) submit a Qualified Bid (as defined below); and (vi) comply with all other applicable requirements.

(b) **Access to Diligence Materials.** Upon execution of the NDA by a Potential Bidder, the Debtor shall afford any Potential Bidder the opportunity to conduct reasonable due diligence, and shall provide access to substantially the same due diligence material provided to Hillcrest. The Debtor will designate an employee or other representative to coordinate all reasonable requests for additional information and due diligence access for the Potential Bidders. Additionally, Hillcrest shall make available to the Debtor (immediately upon request by the Debtor) for disclosure by the Debtor to Potential Bidders copies of any and all environmental reports and title work (including title insurance information) generated by or for the benefit of Hillcrest during its due diligence performed in relation to the potential sale to Hillcrest. The Debtor shall not be obligated to furnish any due diligence information after the Bid Deadline.

(c) **Requirements of Overbid.** Any overbid bid must be not less than the Minimum Overbid set forth below and must state that: (i) the Potential Bidder offers to purchase the Purchased Assets or the assets, executory contracts, and/or unexpired leases of the Debtor that such Potential Bidder seeks to acquire, as set forth in a revised form of the APA; (ii) such Potential Bidder must be prepared to enter into and consummate the transaction within a time frame similar to the timetable for closing established in the APA and set forth herein; and (iii) such offer is irrevocable until the closing of the purchase of the Purchased Assets whether or not such bid is chosen as the highest and best bid.

(d) **Bid Deadline.** All overbids must be submitted so as to be received on or before 4:00 p.m. (Portland, Maine time) on the Bid Deadline (as defined below) by Robert J. Keach, Esq. and D. Sam Anderson, Esq., Bernstein, Shur, Sawyer & Nelson, P.A., 100 Middle Street, P.O. Box 9729, Portland, ME 04104-5029 (Fax: 207-774-1127; email: rkeach@bernsteinshur.com). The Debtor seeks to establish a bid deadline (the "Bid Deadline") of March 24, 2009 at 4:00 p.m.

(e) **Minimum Overbid.** An initial minimum overbid must be not less than the sum of (i) the Purchase Price (representing the Debtor's valuation of Hillcrest's offer); and (ii) the initial overbid increment of $250,000.00. Accordingly, any counteroffers must be in an amount not less than approximately $2.95 million in consideration for the benefit of the estate.

19. Only Qualified Bids will be considered at the Sale Hearing. For the purposes of this Motion, a "Qualified Bid" is a bid that:

(a) Complies with Paragraph 18 (a) through (e) above;

(b) Either (i) does not contain any financing contingency or (ii) if such a financing contingency exists, then such contingency has been satisfied or waived by the Potential Bidder prior to the commencement of the Auction;

(c) Is a bid that the Debtor determines, in the good faith opinion of the Debtor in consultation with the Debtor's counsel, is not materially more burdensome or conditional than the terms of the APA;

(d) Is accompanied by a deposit (in the form of a certified check drawn on a U.S. bank or a wire transfer ) in the amount of ten percent (10%) of the value of the offer, as determined by the Debtor in its sole discretion, which will be returned at the conclusion of the sale process unless (A) the bidder purchases the Purchased Assets, in which case it will be applied to the purchase price or (B) the bidder is the successful bidder but fails or refuses to purchase the Purchased Assets (other than as a result of the Debtor's material breach of the Potential Bidder APA), in which case it will be forfeited to the Debtor's bankruptcy estate; and

(e) Complies with all other applicable requirements.

The offer of Hillcrest shall be deemed a Qualified Bid.

20. In advance of the Auction, the Debtor will give Hillcrest, all other Qualified Bidders, the Committee, and the Office of the United States Trustee, a copy of the Qualified Bids, if any, received in accordance with these procedures. Simultaneously, the Debtor will also deliver to this Court a copy of all Qualified Bids received in accordance with these procedures.

21. If the Debtor does not receive any Qualified Bids, the Debtor will report the same to this Court and proceed to seek approval of the APA.

**B.    The Auction**

22. If the Debtor receives a Qualified Bid or bids, an auction (the "<u>Auction</u>") will be held at the offices of Bernstein, Shur, Sawyer & Nelson, P.A., 100 Middle Street, Portland, ME on March 25, 2009 commencing at 8:00 a.m. Only (i) Qualified Bidders who have timely

submitted Qualified Bids and (ii) Hillcrest (collectively, the "Bidders") will be entitled to make any subsequent Qualified Bids at the Auction.

23. At the Auction, the Bidders will be entitled to submit additional bids for the Purchased Assets. An open auction will occur at the Auction with bidding between the Qualified Bidders until only one Qualified Bidder remains and it is determined by the Debtor, in its sole and absolute discretion, that such bid represents the highest and best bid. The Debtor, after consultation with the Committee, shall have the right at any time during the Auction to change the terms of the Auction governing subsequent rounds of bidding, including, without limitation, by lowering the minimum bidding increment provided that such change is announced to all bidders at the Auction. Subject to the terms herein, such remaining bidder shall be declared the highest and best bidder (the "Successful Bidder") and its bid (the "Successful Bid") shall be submitted to this Court for approval. Notwithstanding the foregoing, at any point during the Auction, the Debtor shall have the absolute right to convert the bidding process from an open auction to a "sealed auction," in which case all Qualified Bidders (including Hillcrest) shall have one opportunity to make a final, sealed Bid. If the Debtor exercises this option, then the Debtor shall collect all sealed Bids, analyze them, and present the highest and best Bid to the Court for approval. With the exception of the initial minimum overbid referred to in Paragraph 18(e) above, each Bid submitted at the Auction must specify the purchase price that the bidder is willing to pay, and must yield proceeds to the Debtor's estate greater than the immediately preceding bid by at least $25,000.00 in cash, credit bid or other consideration. By submitting a bid, each bidder agrees to be bound by the terms of its bid. For the avoidance of doubt, Hillcrest shall submit an open bid for the Purchased Assets in an amount equal to at least the offer

reflected in the APA. Hillcrest shall have the right, but no obligation, to increase the cash consideration payable under the APA in response to a Qualified Bid.

24. The Court shall hold a hearing to hear any objections regarding the Auction, if any, and, to the extent any and all objections are resolved or overruled, approve the sale to the Successful Bidder. Such hearing (the "Sale Hearing") shall be held on March 25, 2009 at 1:00 p.m. at the United States Bankruptcy Court for the District of Maine, 537 Congress Street, 2nd Floor, Portland, Maine.

25. If, for any reason, the Successful Bidder fails to consummate the purchase, the bidder making the second highest and best bid will automatically be deemed to have submitted the Successful Bid, and the Debtor may close with that bidder without further order of this Court. If such second highest bidder does not close, the Debtor may, at its election, close with the next highest bid (and continue with such process until a closing occurs).

26. The Debtor believes that establishing procedures for bidding for the Purchased Assets on the terms contained herein will allow the Debtor to promptly review, analyze and compare all bids received and determine which bid or bids are in the best interests of the Debtor's estate. These procedures will ensure that the Debtor's estate receives the maximum possible amount for the Purchased Assets.

27. As a sale of the Purchased Assets is in the best interests of the Debtor's estate and the bidding procedures are intended to foster bidding to maximize a return on the Purchased Assets, the bidding procedures should be approved by this Court.

### VI. Proposed Procedures Relating to Executory Contracts and Unexpired Leases

28. Currently, there are no executory contracts or unexpired leases being assumed and assigned under the APA, however, Hillcrest may request that the Debtor assume and assign

certain Assigned Contracts. Section 365 of the Bankruptcy Code authorizes a debtor to assume and assign its executory contracts and unexpired leases, subject to approval of the Bankruptcy Court, and provided that certain defaults under such contracts or leases are cured and adequate assurance of future performance is provided. To avoid the time and expense of addressing cure issues on a piecemeal basis, the Debtor requests a procedure (described below) to establish the cure amounts, if any, that are owed under its unexpired leases and executory contracts.

29. To determine the amount that must be paid to each counter-party to an executory contract or unexpired lease (each, a "Counter-Party"), the Debtor needs to accurately determine the extent of its cure obligations, if any. If needed, the Debtor will prepare an exhibit (the "Executory Contracts List") which shall provide a listing of its executory contracts and unexpired leases, as well as the cure amounts, if any, that the Debtor believes is owed under each such contract or lease. The Executory Contracts List will be submitted to the Court prior to the date that the Sale Notice (as defined below) is served on all required parties, and will be appended as Attachment 1 to the bidding procedures (which bidding procedures will be attached to the Sale Notice as an exhibit).[3] The Debtor requests that the Court require any Counter-Party to file and serve by a date established by the Court any objection to the cure amount asserted by the Debtor on the Executory Contracts List. Any such objection should contain the cure amount such Counter-Party believes is owing. The failure of a Counter-Party to submit such objection will forever bar such Counter-Party from asserting any other cure amount or otherwise disputing such amounts with respect to the contracts and leases set forth on the Executory Contracts List.

30. The Debtor requests that this Court hear any objection with respect to any cure amounts at the Sale Hearing or adjourn any hearing on such objection on the condition that the

---

[3] The Debtor believes that the Executory Contracts List will be a complete list of its executory contracts and unexpired leases, but reserves the right to amend that list prior to the hearing on the Sale Motion.

difference between the amount asserted by the Counter-Party and the Debtor, or such lower amount as the Court shall fix, shall be held in escrow from the sale proceeds, pending further order of the Court or mutual agreement of the parties. The Debtor submits that such an objection should not be deemed an objection to the assumption, assignment and sale of any Subject Contract, but only as a reservation of the Counter-Party's rights to request a subsequent determination as to the correct cure amount.

31. Adequate assurance of future performance depends on the facts and circumstances of each case, but should be given "practical, pragmatic construction." See In re Carlisle Homes, Inc., 103 B.R. 524, 538 (Bankr. D.N.J. 1989). As necessary, the proposed assignee must demonstrate to the Court that it can provide adequate assurance of future performance in connection with any executory contract or unexpired lease to be assigned, or will have obtained any necessary consents of the counter-parties to such contract or lease. The Debtor requests that, in connection with the Sale Hearing, the Court determine that Hillcrest, or the maker of the winning bid, has provided adequate assurance of future performance to each Counter-Party.

### VII. Proposed Form and Manner of Notice

32. A proposed form of notice with respect to the sale of the Purchased Assets and the objection, overbid and hearing dates is attached hereto as **Exhibit B** (the "Sale Notice"). The Debtor respectfully requests this Court approve such Sale Notice.

33. In accordance with Rules 2002, 6004, and 6006 of the Bankruptcy Rules, the Debtor intends, upon approval of this Motion, to:

(a) serve copies of the Sale Motion and Sale Notice (via electronic mail or facsimile) upon:

      (i)      counsel to Hillcrest;

      (ii)      prospective bidders (or their counsel) that are known to the Debtor and its advisors;

      (iii)      the Counter-Parties to the executory contracts and unexpired leases on the Executory Contracts List;

      (iv)      all parties known to the Debtor to have or assert any liens, claims and encumbrances or other interests against the Debtor;

      (v)      the state and federal taxing authorities for each jurisdiction in which the Purchased Assets are located;

      (vi)      all parties having filed requests for notices in the Debtor's case;

      (vii)      counsel to the Committee; and

      (viii)      the United States Trustee; and

(b)    serve a copy of the Sale Notice by electronic mail, facsimile or first class mail, upon all creditors.

34. The Debtor submits that such notice constitutes good and sufficient notice of the competitive bidding procedures, the Sale Motion and all proceedings to be held thereon and that no other further notice need be given.

## **CONCLUSION**

35. Approval of the Break-Up Fee, the Expense Reimbursement and the bidding procedures described herein are conditions precedent to the consummation of the sale of the Purchased Assets to Hillcrest. Based upon the timing considerations and the requirements of Hillcrest and what the Debtor believes are the best interests of the estate, the Debtor requests that the terms of such provisions be approved by this Court.

WHEREFORE, the Debtor respectfully requests this Court to enter an order:

A)    Approving the bidding procedures described herein, including, without limitation, the initial overbid amount and the subsequent bidding intervals;

B) Approving the form and content of the Notice of Sale attached hereto as **Exhibit B**;

C) Approving the cure procedures as provided for herein;

D) Approving the Break-Up Fee and the Expense Reimbursement and authorizing the Debtor to pay the Break-Up Fee and Expense Reimbursement in accordance with the terms of this Motion;

E) Establishing a date and time for the final hearing on the Sale Motion and setting the deadline for objections or overbids; and

F) Granting such other and further relief as is just and equitable.

Dated: March 12, 2009

   /s/ Sam Anderson
D. Sam Anderson, Esq.
BERNSTEIN, SHUR, SAWYER & NELSON, P.A.
100 Middle Street, P.O. Box 9729
Portland, Maine 04104-5029
(207) 774-1200

Counsel for the Debtor and Debtor-In-Possession